Below is an Opinion of the Court.

1

2

3

4

5

6                                                 _Randall L. Dunn_
                                                  RANDALL L. DUNN
                                                  U.S. Bankruptcy Judge
7

8                    UNITED STATES BANKRUPTCY COURT

9                       FOR THE DISTRICT OF OREGON

10  In Re:                          )  Bankruptcy Case
                                    )  No. 09-36520-rld7
11  NICHOLAS CARL HOWELL,           )
                                    )
12                    Debtor.       )
    _____)
13                                  )  Adversary No. 10-03040-rld
    UNITED STATES TRUSTEE,          )
14                                  )  MEMORANDUM OPINION
                                    )
15                    Plaintiff,    )
                                    )
16            v.                    )
                                    )
17  NICHOLAS CARL HOWELL,           )
                                    )
18                    Defendant.    )
    _____)
19

20      On February 2-4, 2011, I received evidence and heard testimony and

21  argument at the trial ("Trial") of the United States Trustee's ("UST")

22  Complaint for Denial of Discharge ("Complaint") to the debtor, Nicholas

23  Carl Howell ("Mr. Howell").  The parties previously had filed a Final

24  Joint Pretrial Order ("Pretrial Order") on January 24, 2011.  See

25  Adversary Proceeding Docket No. 29.  At the conclusion of the Trial, I

26  took the matter under advisement.


Page 1 - MEMORANDUM OPINION

In deciding this matter, I have considered carefully the testimony presented and the exhibits admitted at the Trial, as well as arguments presented, both in legal memoranda and orally. I further have taken judicial notice of the docket and documents filed in this adversary proceeding ("Adversary Proceeding") and in related adversary proceedings, and in Mr. Howell's main chapter 7 case, Case No. 09-36520 ("Main Case"), for purposes of confirming and ascertaining facts not reasonably in dispute. Federal Rule of Evidence 201; <u>In re Butts</u>, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006). In addition, I have reviewed relevant legal authorities.

In light of that consideration and review, this Memorandum Opinion sets forth the court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a), applicable in this Adversary Proceeding under Federal Rule of Bankruptcy Procedure 7052.[1]

<u>Factual Background</u>

A. <u>Mr. Howell's Business Background</u>

Mr. Howell has worked in the road race and sports event services business since 1994. In 1994, Mr. Howell went to work for AA Sports, Ltd., an Oregon corporation ("AA Sports"). He started out working on "RaceCenter," a sports publication produced by AA Sports. Later, he assisted in timing road race events for AA Sports. He left AA Sports in 1997 or 1998.

---

[1] Hereafter, unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

Page 2 - MEMORANDUM OPINION

After leaving AA Sports, Mr. Howell performed consulting work on a contract basis for Nike and the Arthritis Foundation regarding road race events.  On December 17, 2001, Mr. Howell formed Performance Marketing, LLC ("Performance Marketing"), of which he was the sole member, to provide sports consulting services.  Performance Marketing did business under the name "PM Events."  Performance Marketing was administratively dissolved on February 17, 2006.

On December 26, 2001, Mr. Howell formed Winning Time Portland, LLC ("Winning Time"), of which he was the sole member, to provide timing services for road race events.  Winning Time did business under the names "Perfect Time Events" and  "Winning Time USA Portland."  Winning Time was administratively dissolved on February 27, 2004.

On March 26, 2002, Mr. Howell formed Athleteslounge.com, LLC ("Athleteslounge.com"), of which he was the sole member, to provide software and other assistance to road race organizers, to manage data and online registrations services for road race events, and to time road races.  Athleteslounge.com was administratively dissolved on May 25, 2007.

From some time in 2003 to 2007, Mr. Howell and a business partner, Keith Willis, operated three bicycle shops.  On July 21, 2003, Mr. Howell and Mr. Willis formed Gateway Bicycles, LLC ("Gateway Bicycles").  Both Mr. Howell and Mr. Willis were members of Gateway Bicycles.  Gateway Bicycles also did business under the names "Speed Zone" and "Gateway Speed Zone."  In 2005, Mr. Howell transferred his member interest in Gateway Bicycles to Mr. Willis.

Following the termination of his interest in Gateway Bicycles, Mr.

Howell operated a retail business under the assumed name "AthletesLounge" starting in 2005. While characterized as a "bicycle retail business" in the Pretrial Order, Mr. Howell testified that the AthletesLounge retail business was a triathlon store. Accordingly, the store, located in Northwest Portland, apparently sold apparel and other items of interest to swimmers and runners, as well as bicycles and accessories. Mr. Howell also started selling bicycles from a warehouse in Hillsboro, Oregon.

During the period that Mr. Howell operated the AthletesLounge retail business, he also operated as Athleteslounge.com, performing road race event timing, data management and road race event registration services.

On November 2, 2008, Carlo Faccino, the owner of By the Beach Productions, LLC ("By the Beach"), sent a demand for payment in a total amount of $26,957.50 to Mr. Howell for unpaid race entry fees and alleged overcharges for timing services. Thereafter on November 19, 2008, Mr. Howell paid $5,000 to By the Beach but otherwise did not respond to the payment demand. On July 31, 2009, an attorney for By the Beach sent a demand letter to Mr. Howell for the unpaid balance of $21,957.50.

On January 30, 2009, Seafair, a nonprofit entity located in King County, Washington, filed a complaint against Mr. Howell in the Washington County Circuit Court ("Circuit Court"), alleging that Mr. Howell had failed to remit a total of $149,483.96 in race entry fees to Seafair. On August 6, 2009, the Circuit Court entered an order granting summary judgment in favor of Seafair against Mr. Howell. A general judgment in favor of Seafair was entered against Mr. Howell on August 6, 2009 for damages of $149,483.96, pre- and postjudgment interest, costs, disbursements, and attorney's fees to be determined under Or. R. Civ. P.

Page 4 - MEMORANDUM OPINION

68C.  On August 7, 2009, Seafair, through its attorneys, mailed writs of garnishment via certified mail to Morgan Stanley & Co. Incorporated ("Morgan Stanley"), Wells Fargo Bank, The Commerce Bank of Oregon ("Commerce Bank"), and Consolidated Federal Credit Union ("Consolidated Federal").

On August 10, 2009, Consolidated Federal processed the writ of garnishment it had received and debited account number 2567, held jointly in the names of Mr. Howell and his wife, Heather M. Howell ("Ms. Howell"), in the amount of $1,714.29.  On August 11, 2009, Ms. Howell opened a new account, number 9669, solely in her name at Consolidated Federal.

On August 12, 2009, Mr. Howell sought protection under chapter 7 of the Bankruptcy Code.  In his bankruptcy petition, Mr. Howell stated that he operated under the following "AKA's:" Nick Howell, AthletesLounge, AthletesLounge LLC, AthletesLounge.com LLC, Perfect Time Events LLC, PM Events LLC, Performance Marketing LLC, Speed Zone Beaverton, Tri Sport Running & Walking LLC, Gateway Bicycles LLC, TriathletesLounge, Speed Zone, and Winning Time USA-Portland.  <u>See</u> Main Case Docket No. 1.  At the time of his bankruptcy filing and at all times relevant to the events concerned in this Adversary Proceeding, Mr. Howell conducted all of his business operations as sole proprietorships and not as incorporated or limited liability company entities, in spite of the "LLC's" included in some of his "AKA's."

B.  <u>Events and Proceedings in the Main Case and Adversary Proceeding</u>

Mr. Howell filed his chapter 7 petition on August 12, 2009 at 4:08 pm.  On August 13, 2009, the court entered an Order and Notice

Page 5 - MEMORANDUM OPINION

Regarding Time to File Documents requiring Mr. Howell to file his Summary of Schedules, all schedules, and his Statement of Financial Affairs (collectively, the "Missing Documents") by August 27, 2009. On August 27, 2009, counsel for Mr. Howell filed a Motion to Extend Time to File Documents, requesting an extension of time through September 10, 2009 to file the Missing Documents. That motion was granted by order of the court entered on August 31, 2009. Mr. Howell filed the Missing Documents on September 10, 2009, signed under penalty of perjury.

The § 341(a) meeting of creditors ("Meeting of Creditors") was scheduled for and concluded on September 18, 2009. Mr. Howell testified under oath at the Meeting of Creditors.

Mr. Howell signed amended Schedules A, B, C, I and J ("First Amended Schedules") and an amended Statement of Financial Affairs ("Amended Statement of Financial Affairs") under penalty of perjury on October 26, 2009. The First Amended Schedules and Amended Statement of Financial Affairs were filed on October 27, 2009.

Mr. Howell signed and filed a second amended Schedule B ("Second Amended Schedule B") under penalty of perjury on January 11, 2011.

On December 18, 2009, the UST conducted a Rule 2004 examination of Mr. Howell, at which Mr. Howell testified under oath.

On November 16, 2009, the Washington County Visitors Association ("WCVA") filed an adversary proceeding complaint, Case No. 09-3380-rld, against Mr. Howell to except its claims against Mr. Howell from discharge pursuant to § 523(a)(2)(A). The WCVA adversary proceeding has been abated pending resolution of this Adversary Proceeding.

On November 16, 2009, Seafair filed an adversary proceeding

Page 6 – MEMORANDUM OPINION

complaint, Case No. 09-3382-rld, against Mr. Howell to except its claims

against Mr. Howell from discharge pursuant to §§ 523(a)(2)(A) and

523(a)(4), and/or to deny Mr. Howell a discharge pursuant to

§§ 727(a)(2)-(5) and 727(c). See Ex. 31. The Seafair adversary

proceeding has been abated pending resolution of this Adversary

Proceeding.

On November 17, 2009, Enviro-Sports Productions, Inc. ("Enviro-

Sports"), filed an adversary proceeding complaint, Case No. 09-3385-rld,

against Mr. Howell to except its claim in the amount of $451,189.42

against Mr. Howell from discharge pursuant to §§ 523(a)(2)(A) and

523(a)(4), and/or to deny Mr. Howell a discharge pursuant to § 727(a)(5).

See Ex. 32. The Enviro-Sports adversary proceeding has been abated

pending resolution of this Adversary Proceeding.

On December 4, 2009, By the Beach filed an adversary proceeding

complaint, Case No. 09-3418-rld, against Mr. Howell to except its claim

in the amount of $19,107.00 against Mr. Howell from discharge pursuant to

§§ 523(a)(2)(A), 523(a)(4) and 523(a)(6). See Ex. 34. The By the Beach

adversary proceeding likewise has been abated pending resolution of this

Adversary Proceeding.

On February 14, 2010, the UST timely filed the Complaint in this

Adversary Proceeding. Mr. Howell filed his Answer to the Complaint on

April 13, 2010. Thereafter, following several pretrial hearings,

primarily for scheduling purposes, the Adversary Proceeding was scheduled

for trial and was tried on February 2-4, 2011.

C. WCVA Grant

In the spring of 2009, Mr. Howell applied to the WCVA for a

Page 7 - MEMORANDUM OPINION

community grant to fund the Hulaman Triathlon event to take place in Forest Grove, Oregon later in the year. Ms. Ruthie Reinert, retired CEO/President of the WCVA, testified at the Trial. According to Ms. Reinert, the WCVA is an agency responsible for increasing tourism in Washington County, Oregon. It is funded from hospitality/room taxes-the "Bed Tax." In 2009, the WCVA had a total of $210,000 available to fund community grants. Community grants are dedicated for use in marketing to attract more out of town visitors and increase hotel/motel stays and restaurant patronage. The deadline for grant applications was early in April, and Mr. Howell filed an application on April 2, 2009 that was received and considered. See Ex. 28, at pp. 35-48.

The WCVA ultimately awarded Mr. Howell a community grant of $50,000 for the Hulaman Triathlon event, which was the largest WCVA community grant in 2009. Mr. Howell signed a WCVA Tourism Development Grant Agreement ("Grant Agreement") on July 10, 2009. See Ex. 28, at pp. 31-34. The Grant Agreement included specific provisions with respect to disbursements of grant funds to reimburse recipients:

> Obligations of the WCVA: 1. The WCVA shall reimburse the recipient based on invoices submitted. The total amount authorized for such reimbursement or payments shall not exceed $50,000. The WCVA shall pay the requests within 30 days of the receipt of the invoice. No monies will be paid without proper supporting documentation.

See Ex. 28, at p. 32.

Ms. Reinert testified that she personally sat down with grant recipients and explained the process for requesting and receiving grant funds. She emphasized that grants were used for reimbursement of grant recipients' documented expenses. The documentation requirement was a

Page 8 - MEMORANDUM OPINION

control to ensure that grant funds were used as intended. Grant funds could not be expended on obligations that were not preapproved. The documentation required by the WCVA included copies of invoices and checks actually written and/or evidence of credit charges actually incurred. Ms. Reinert testified that both she and Martha Moore, the WCVA Finance Manager, reviewed grant recipients' reimbursement requests. She also testified that she personally explained these requirements to Mr. Howell. Mr. Gary Wallesen, a former employee of Mr. Howell who made the initial contact with the WCVA, confirmed that it was his understanding that WCVA community grant disbursements were to be based on reimbursement requests supported by invoices and copies of checks that had been written.

Mr. Howell's first WCVA community grant disbursement was in the amount of $14,498.00, paid on July 16, 2009. See Ex. 28, at p. 48. The disbursement request was supported by invoices from Cobalt Coyote Creative ($4,498.00) and RaceCenter NW Magazine ($10,000.00), with copies of checks written to pay them, dated July 8, 2009 and July 7, 2009, respectively. See Ex. 28, at pp. 51-54. WCVA made two further community grant disbursements to Mr. Howell on August 19, 2009, following his bankruptcy filing, in the amounts of $10,312.50, to cover travel and vendor expenses, and $24,800, to cover purses for the athletes participating in the Hulaman Triathlon. See Ex. 28, at p. 1. Copies of the supporting documentation for the August 19, 2009 disbursements, including copies of invoices and payment checks, are included in Ex.28 at pp. 2-10, and 12-28. Ms. Reinert testified that only the checks for the athletes' purses would not require supporting invoices.

After WCVA disbursements for the community grant to Mr. Howell, Ms.

Reinert received a number of calls from Hulaman vendors, including
RaceCenter NW Magazine, indicating that they had not been paid. Mr.
Howell responded to a call from Ms. Reinert about the RaceCenter NW
Magazine bill in particular, indicating that there was a dispute about
the bill. Ms. Reinert received further communications after August 19,
2009, indicating that bills, including the invoice from RaceCenter NW
Magazine, still had not been paid. Mr. Howell testified that the
original checks supporting the disbursements of the WCVA community grant
funds were not used but were drawn and submitted to show his "intent to
pay." He further testified that his understanding of the Grant
Agreement, based on his communications with Ms. Reinert, was that he
would not have to advance any cash before community grant disbursements
were made.

Mr. Christopher Boudreaux, a principal of Skyline Racing, LLC
("Skyline Racing"), who had contacted the professional athletes who
participated in the Hulaman Triathlon event and made arrangements for
them to come, testified that it was Skyline Racing, rather than Mr.
Howell, that ultimately paid the athletes' purses for the Hulaman
Triathlon.

Even though Mr. Howell received a total of $35,112.50 in WCVA
community grant funds postpetition, Mr. Howell did not include the
undisbursed community grant funds as an asset on his original Schedule B,
in the First Amended Schedules or in his Second Amended Schedule B.

D. $9,000 Cashier's Check

In light of the substantial judgment Seafair obtained against him on
August 6, 2009 and the subsequent garnishment of his joint account at

Page 10 - MEMORANDUM OPINION

Consolidated Federal on August 10, 2009, Mr. Howell called Commerce Bank on August 11, 2009 to arrange to receive a $9,000 cashier's check from his account in the name of "Nick Howell dba Athleteslounge.com."  <u>See</u> Ex. 46, at p. 77.  The $9,000 cashier's check was issued by Commerce Bank on August 11, 2009 and delivered to Mr. Howell.  <u>See</u> Exs. 13 and Q.  Mr. Howell testified that he delivered the $9,000 cashier's check to Mr. Keith Pulley, his friend and financial advisor at Morgan Stanley, on August 12, 2009, for deposit to cover an overdraft in his Morgan Stanley business account.  The timing of his delivery of the $9,000 cashier's check to Mr. Pulley was a moving target during the presentation of testimony.

On cross-examination, Mr. Howell testified initially that he picked up the $9,000 cashier's check at Commerce Bank on August 12, 2009 and immediately walked over to Morgan Stanley to deliver it.  He testified that he left Morgan Stanley after delivering the $9,000 cashier's check to Mr. Pulley between 10:00 and 11:00 am.  After cashing a $5,000 Morgan Stanley counter check that he received from Mr. Pulley at Bank of America, Mr. Howell testified that he traveled to his triathlon store in Northwest Portland to pay some employees, based on hours worked.  (<u>See</u> Section E <u>infra</u> for a fuller discussion regarding the $5,000 counter check.)  Thereafter, Mr. Howell testified, he joined Mr. Pulley for a 1-2 hour lunch.  He then testified that he actually delivered the $9,000 cashier's check to Mr. Pulley at lunch.  After lunch, he went to his bankruptcy counsel's office to obtain credit counseling over the internet, do some preliminary work on filling out bankruptcy schedules, and sign his bankruptcy petition prior to its filing at 4:08 pm.  Mr.

Page 11 - MEMORANDUM OPINION

Howell's Credit Counseling Certificate states that his credit counseling briefing was received at 2:57 pm on August 12, 2009.  <u>See</u> Main Case Docket No. 2.

Mr. Pulley testified that on August 12, 2009, Mr. Howell was in downtown Portland doing other business and met him for a late lunch.  Mr. Pulley testified that Mr. Howell delivered the $9,000 cashier's check to him at lunch.  Mr. Pulley thought that it was "Happy Hour" at the restaurant where they had lunch by the time Mr. Howell delivered the $9,000 cashier's check to him.  Mr. Pulley testified that "Happy Hour" starts at that establishment at 3:00-3:30 pm.  By the time Mr. Pulley got back to his office at Morgan Stanley, it was after 4:00 pm, and the office was closed for business.  Mr. Pulley testified that he locked the $9,000 cashier's check in a desk drawer for deposit when the office opened the next day.  He wrote the deposit slip to deposit the $9,000 cashier's check in Mr. Howell's Morgan Stanley account on August 13, 2009, the day after Mr. Howell filed his bankruptcy petition.  <u>See</u> Ex. R.

There is no reference to the $9,000 cashier's check in any Schedule B filed by Mr. Howell.  <u>See</u> Ex. 2, at pp. 9-12; Ex. 3, at pp. 4-7; and Ex. 8, at pp. 3-6.  There is a reference to a $9,000 debit for "Cashier Check #302241-Nick Howell" on page 6 in the attached response to Question 3b in Mr. Howell's Statement of Financial Affairs and Amended Statement of Financial Affairs, relating to payments or any other transfers to creditors.  <u>See</u> Ex. 2, at pp. 33 and 39; and Ex. 4, at pp. 2 and 8.

E.  <u>$5,000 Counter Check</u>

In the morning on August 12, 2009, Mr. Howell obtained a $5,000 counter check in his name, drawn on his Morgan Stanley business account,

Page 12 - MEMORANDUM OPINION

from Mr. Pulley.  Mr. Howell then cashed the $5,000 counter check at Bank of America.  See Ex. T.  What happened to the $5,000 cash thereafter is the subject of a number of different accounts: At his Rule 2004 examination, Mr. Howell testified as to his assumption that he used the $5,000 counter check to pay "permit fees" for the Hulaman Triathlon event.  See Ex. 45, at p. 110.  At his deposition, Mr. Howell testified that he put the $5,000 cash in an envelope and gave it to Mr. Wallesen at the Northwest Portland triathlon store.  See Ex. 46, at p. 42.  Again, at his deposition, Mr. Howell testified that he gave the $5,000 to Mr. Wallesen to "cover payroll" and "for the [Hulaman Triathlon] event that weekend."  See Ex. 46, at p. 44.  On direct examination at Trial, Mr. Howell testified that he personally paid out $3,000-$3,500 of the cash to a disgruntled casual employee and two other employees for compensation owed and left the balance with Mr. Wallesen to distribute.  On cross-examination, Mr. Howell testified that after he cashed the $5,000 counter check at Bank of America, he went to the Northwest Portland triathlon store, arriving at about 11:00 am, where he paid employees who were present.  Then, he went to lunch with Mr. Pulley, and from there, he went to his counsel's office to work on his bankruptcy filing.

Scott Benjamin, who worked at the Northwest Portland triathlon store, testified to recalling a time when Mr. Howell arrived with an envelope containing cash that he understood was to be used to pay some of the "mechanics."  Mr. Benjamin did not see the mechanics actually paid. Mr. Wallesen testified that he remembers some contact with Mr. Howell on August 12, 2009.  He also testified that he received cash at some point prior to the Hulaman Triathlon, $1,500-$2,000 in an envelope, to pay

Page 13 - MEMORANDUM OPINION

flaggers and other expenses.  However, Mr. Wallesen further testified
that he received the cash from Mr. Howell in Hillsboro and not at the
Northwest Portland triathlon store.  Mr. Howell testified on cross-
examination that he does not remember traveling to Hillsboro to deliver
any money to Mr. Wallesen.

Paychex, Inc. ("Paychex") performed payroll services for Mr. Howell
under the name "Athleteslounge.com LLC," but its services were terminated
on July 30, 2009.  <u>See</u> Ex. 35.  No payroll or payroll withholding records
for Mr. Howell's businesses for the month of August 2009, and
specifically for August 12, 2009, were submitted in evidence at the
Trial.

F.  <u>Mr. Howell's 2009 Income Prepetition</u>

In his Statement of Financial Affairs and Amended Statement of
Financial Affairs, in response to Question 1, where the debtor is asked
to "[s]tate the <u>gross amount</u> of income the debtor has received from
employment, trade, or profession, or from operation of the debtor's
business" (emphasis added), Mr. Howell stated under penalty of perjury
that his 2009 income to the date of his bankruptcy filing was $43,200.00.
<u>See</u> Ex. 2, at p. 32; Ex. 4, at p. 1.  Ms. Tammy Combs, the UST's
bankruptcy analyst, reviewed Mr. Howell's bank statements and business
records obtained during the course of discovery and concluded based on 1)
deposits to Mr. and Ms. Howell's joint account at Consolidated Federal;
2) a deposit to the separate account established by Ms. Howell at
Consolidated Federal; 3) expenses of Mr. Howell paid from the Morgan
Stanley business account; and 4) expenses of Mr. Howell paid from the
Commerce Bank account, that Mr. Howell's gross income for January 1

through August 12, 2009 actually totaled $113,373.21.  <u>See</u> Ex. 42.

In his Trial Memorandum, Mr. Howell argues that in spite of the information requested in Question 1 of the Statement of Financial Affairs, Mr. Howell disclosed his income appropriately, as "gross receipts less his business expenses."  <u>See</u> Adversary Proceeding Docket No. 28, at p. 14.  At the Trial, Mr. Howell presented his own analysis of income v. expenses and concluded that his income from January 1, 2009 through the filing date was roughly $42,000.  <u>See</u> Ex. X.

At the time of Trial, Mr. Howell had not prepared his 2009 tax returns; so, his 2009 tax returns were not submitted as exhibits.  No personal or business financial statements for Mr. Howell for 2009 were submitted in evidence.

G.  <u>Morgan Stanley Business Account Balance on the Filing Date</u>

In his Schedule B, as filed originally and as amended, Mr. Howell stated under penalty of perjury that he had $780 in his Morgan Stanley business account on the filing date.  <u>See</u> Ex. 2, at p. 9; Ex. 3, at p. 4; and Ex. 8, at p. 3.  The UST contended that the Morgan Stanley business account balance on the filing date was understated.  Mr. Howell countered that the Morgan Stanley business account balance on the filing date was actually overstated and should have been listed as negative (-) $780. Mr. Howell submitted Exhibit V at Trial, showing his analysis of activity in the Morgan Stanley business account from July 31 through August 12, 2009, showing a final balance of negative (-) $746.04.

H.  <u>Sale of Brewery Equipment</u>

At some time during a period from 2004 to 2006, Mr. Howell joined a group of investors to acquire some brewing equipment ("Brewing

Page 15 - MEMORANDUM OPINION

Equipment") from a brewery liquidating in San Luis Obispo, California. The original idea was to bring the Brewing Equipment to Portland to set up a small brewing operation, but it never got off the ground. The Brewing Equipment was simply transferred to Portland and put in storage.

Eventually, one of the investors, Mr. Charlie Wolff ("Mr. Wolff"), took on the responsibility for liquidating the Brewing Equipment and ultimately realized a total of $10,200.40 from its disposition. See Ex. 39. Mr. Wolff e-mailed information regarding proceeds from the sale of the Brewing Equipment to the investors. See Ex. 36. Mr. Howell recalls that he saw Mr. Wolff's e-mail dated August 11, 2009, the day before Mr. Howell's bankruptcy filing. Yet he did not list any interest in the Brewing Equipment on his original Schedule B. See Ex. 2, at pp. 9-12. Nor did Mr. Howell reveal any interest in the Brewing Equipment in his First Amended Schedules that he signed on October 26, 2009 under penalty of perjury, even though he received a check in the amount of $4,021.39 for his share of the Brewing Equipment liquidation proceeds on or about October 19, 2009. See Ex. 23. Mr. Howell testified that he explained his "oversight" later to the chapter 7 trustee and promised to pay his share of the Brewing Equipment liquidation proceeds to the estate.

The trustee filed a motion for turnover of the Brewing Equipment proceeds after Mr. Howell breached his agreement to pay over the proceeds in three installments commencing in October 2010 and ending on December 31, 2010. Mr. Howell did not make any of the scheduled installment payments. See Main Case Docket No. 108.

Mr. Howell testified that he finally borrowed the money to pay the

Page 16 - MEMORANDUM OPINION

amount of his share of the Brewing Equipment liquidation proceeds to the estate. He did list his interest in the Brewing Equipment as an asset in his Second Amended Schedule B. See Ex. 8, at p. 6.

I. Ernie Conway and the Elkhorn Classic and OUCH Events

Exhibit IV is a copy of a check Mr. Howell wrote to Mr. Ernie Conway, dated August 26, 2009, in the amount of $12,800, with the notation "For Elk/OUCH." The Elkhorn Classic State Race ("Elkhorn Classic") apparently took place on Friday, June 19 to Sunday, June 21, 2009. See Ex. V. OUCH: The Larch Mountain Time Trial ("OUCH") apparently was a "time trial racing" event that took place on Sunday, July 26, 2009. See Ex. VII. In his deposition, Mr. Howell testified that he handled registrations for both events: "I took the entry fees and then [paid] them out." Ex. 46, at pp. 100-01. E-mail communications between Mr. Conway and Mr. Howell from the period August 23-26, 2009 indicate that Mr. Howell had an outstanding obligation to Mr. Conway from the Elkhorn Classic and OUCH events that Mr. Howell planned to take care of by "paying you out of my own funds rather than have you wait on a larger [resolution]" in his bankruptcy. See Ex. VIII. At the Trial, Mr. Howell testified that he did not know what he owed to Mr. Conway on the date of his bankruptcy filing, but he admitted that he paid Mr. Conway postpetition. He did not include Mr. Conway as having a general unsecured claim in his Schedule F. See Ex. 2, at pp. 19-26.

### Jurisdiction

I have jurisdiction to decide the claims at issue in this Adversary Proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(J).

///

Page 17 - MEMORANDUM OPINION

I.  <u>Generally Applicable Legal Standards</u>

A primary objective of the Bankruptcy Code, recognized by the Supreme Court, is to provide a "fresh start" to debtors overburdened by debts they cannot pay.

> This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."

Grogan v. Garner, 498 U.S. 279, 286 (1991) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)).  Accordingly, I start from the proposition that the provisions of the Bankruptcy Code pursuant to which a debtor's discharge can be denied are to be construed strictly in favor of the debtor.

> A denial of a discharge is an act of mammoth proportions, and must not be taken lightly.  In light of this gravity, this Court and many others have stated that Section 727 must be construed liberally in favor of the debtor and against the objector.

In re Goldstein, 66 B.R. 909, 917 (Bankr. W.D. Pa. 1986).  See First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986); Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985).  However, a discharge in bankruptcy is available only to the "honest but unfortunate debtor."  Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007); Cohen v. De la Cruz, 523 U.S. 213, 217 (1998); Grogan v. Garner 498 U.S. at 286-87 ("[I]n the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new

Page 18 - MEMORANDUM OPINION

beginning to the 'honest but unfortunate debtor.'").

The plaintiff in an adversary proceeding seeking to deny the debtor a discharge bears the burden of proving, by a preponderance of the evidence, that the debtor's conduct fits within one or more of the provisions of § 727 under which a discharge can be denied. Grogan v. Garner, 498 U.S. at 289; Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010); Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (BAP 9th Cir. 2007), aff'd, 578 F.3d 1167, 1168 (9th Cir. 2009). The relatively lenient burden of proof standard in denial of discharge cases compared with the consistent directive to interpret denial of discharge standards in favor of the debtor creates a tension that weighs in the process of bankruptcy courts' decisions on § 727 claims. The Ninth Circuit interprets this issue as relating primarily to questions of intent. "This does not alter the burden on the objector, but rather means that 'actual, rather than constructive, intent is required' on the part of the debtor." In re Retz, 606 F.3d at 1196, citing In re Khalil, 379 B.R. at 172.

An essential element to deny a discharge under many of the subsections of § 727(a), including § 727(a)(4), is fraudulent intent. Recognizing the reality that few debtors are likely to break down and confess to fraud in their testimony, fraudulent intent may be established through circumstantial evidence or evidence of a pattern of conduct consistent with the wrongful conduct alleged. See, e.g., In re Adeeb, 787 F.2d at 1343; In re Devers, 759 F.2d at 754 ("Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a

1  case."); and <u>In re Johnson</u>, 68 B.R. 193, 198 (Bankr. D. Or. 1986).

2  II.  <u>727 Claims at Issue</u>

3      In the Complaint, the UST stated claims for denial of Mr. Howell's
4  discharge under §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(3), 727(a)(4)(A)
5  [three claims] and 727(a)(5).  In the Pretrial Order, the UST asserts
6  claims under §§ 727(a)(4)(A) [four claims], 727(a)(2)(A) and
7  727(a)(2)(B).  I treat the Pretrial Order as limiting the scope of claims
8  to be determined from the Trial.  <u>See</u> Civil Rule 16(d), applicable in
9  this Adversary Proceeding under Rule 7016.  Accordingly, the claims
10 stated in the Complaint under §§ 727(a)(3) and 727(a)(5) are deemed
11 abandoned and dismissed.  I start the analytical discussion with the
12 UST's claims under § 727(a)(4)(A).

13 III.  <u>Section 727(a)(4)(A)</u>

14     Section 727(a)(4)(A) states that, "The court shall grant the debtor
15 a discharge, unless . . . the debtor knowingly and fraudulently, in or in
16 connection with the case–(A) made a false oath or account."  In order to
17 prevail on such a claim, the plaintiff must establish by a preponderance
18 of the evidence each of four elements:  "(1) the debtor made a false oath
19 in connection with the case; (2) the oath related to a material fact; (3)
20 the oath was made knowingly; and (4) the oath was made fraudulently."  <u>In</u>
21 <u>re Retz</u>, 606 F.3d at 1197, quoting <u>Roberts v. Erhard (In re Roberts)</u>, 331
22 B.R. 876, 882 (BAP 9th Cir. 2005).  "A false statement or an omission in
23 the debtor's bankruptcy schedules or statement of financial affairs can
24 constitute a false oath."  <u>In re Khalil</u>, 379 B.R. at 172.

25     The purpose of § 727(a)(4) "is to ensure that dependable
       information is supplied to those interested in the
26     administration of the bankruptcy estate so that they can rely

Page 20 – MEMORANDUM OPINION

upon it without the need for the trustee or other interested parties to dig out these true facts in examination or investigations;" the opportunity to obtain a fresh start is thus conditioned upon truthful disclosure.

Aubrey v. Thomas (In re Aubrey), 111 B.R. 268, 274 (BAP 9th Cir. 1990), quoting Camacho v. Martin (In re Martin), 88 B.R. 319, 325 (D. Colo. 1988). See Fogal Legwear of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (BAP 9th Cir. 1999) ("The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations.").

"Materiality" is very broadly defined in this context. "A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Id. at 62. See In re Khalil, 379 B.R. at 173. "An omission or misstatement that 'detrimentally affects administration of the estate' is material." In re Retz, 606 F.3d at 1198, quoting In re Wills, 243 B.R. at 63.

A debtor "acts knowingly if he or she acts deliberately or consciously." In re Roberts, 331 B.R. at 883.

As for acting fraudulently, we held in [In re] Roberts that the elements of common law fraud substantially overlap the elements of a claim under Section 727(a)(4)(A), except that "materiality replaces the elements of reliance and proximately caused damage," so that the creditor must show: "(1) [that] the debtor made the representations [e.g., a false statement or omission in bankruptcy schedules]; (2) that at the time he knew they were false; [and] (3) that he made them with the intention and purpose of deceiving the creditors . . . ." [331 B.R.] at 884.

In re Khalil, 379 B.R. at 173 (emphasis in original).

The UST asserts four claims under § 727(a)(4)(A) in the Pretrial

Page 21 - MEMORANDUM OPINION

Order: 1) that Mr. Howell knowingly and fraudulently made materially false statements in his schedules, Statement of Financial Affairs and related documents; 2) that Mr. Howell knowingly and fraudulently made materially false statements in his amended schedules and Statement of Financial Affairs; 3) that Mr. Howell knowingly and fraudulently made materially false statements under oath during his Meeting of Creditors; and 4) that Mr. Howell knowingly and fraudulently made materially false statements under oath during his Rule 2004 examination by the UST.

While the UST's § 727(a)(4)(A) claims are not entirely congruent, they are all closely related to alleged misrepresentations or omissions to state material facts concerning the following matters: 1) the $9,000 cashier's check; 2) the $5,000 counter check; 3) the amount of cash Mr. Howell had at the time of his bankruptcy filing; 4) the balance for Mr. Howell's Morgan Stanley business account at the time of filing; and 5) the representation by Mr. Howell that his income for the period from January 1, 2009 through the filing date was only $43,200.

The first element that must be established in a § 727(a)(4)(A) case is the existence of a false oath in connection with a bankruptcy case. Section 521 requires all debtors in bankruptcy to "file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, a schedule of current income and current expenses, and a statement of the debtor's financial affairs." Rule 1008, which implements provisions of § 521, requires that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration . . . ." Mr. Howell signed his original schedules and Statement of Financial Affairs, his First Amended Schedules, his

Page 22 - MEMORANDUM OPINION

Amended Statement of Financial Affairs, and his Second Amended Schedule B under penalty of perjury.  The false oath element also may be established based on statements made by the debtor during examination at the § 341(a) meeting of creditors.  See, e.g., Netherton v. Baker (In re Baker), 205 B.R. 125, 131 (Bankr. N.D. Ill. 1997); Lanker v. Wheeler (In re Wheeler), 101 B.R. 39, 49 (Bankr. N.D. Ind. 1989).

At the Trial, I observed Mr. Howell during the course of extended direct and cross-examination.  Mr. Howell obviously is intelligent, and during the course of his business career to date, he apparently saw opportunities to introduce innovations in his field of sports event services, particularly in internet sports event registrations, that he moved to exploit.  Unfortunately, his business ventures seem to have outgrown his ability to manage them, and he is in bankruptcy.  While Mr. Howell is an engaging person, I found him neither honest nor credible in his testimony about his business affairs.  In fact, his testimony was undercut by his own witness on some important points, as discussed more fully below.  Following is my analysis with respect to each of the factual allegations upon which the UST's § 727(a)(4)(A) claims are based.

a) The $9,000 cashier's check

The circumstances of Mr. Howell obtaining the $9,000 cashier's check from Commerce Bank on August 12, 2009 and delivering it to Mr. Pulley should have been disclosed on Mr. Howell's Schedule B or in his Statement of Financial Affairs.  They were not disclosed in Mr. Howell's original schedules and Statement of Financial Affairs, in his First Amended Schedules, in his Amended Statement of Financial Affairs, or in his Second Amended Schedule B.  While Mr. Howell may have intended that the

Page 23 - MEMORANDUM OPINION

$9,000 cashier's check be deposited in his Morgan Stanley business account, as it ultimately was <u>on the day after his bankruptcy filing</u>, the fact remains that at the time Mr. Howell's bankruptcy petition was filed, a $9,000 cashier's check existed in Mr. Howell's name in the possession of Mr. Pulley.

Mr. Howell's first line of defense is that the $9,000 cashier's check was disclosed in his statement of the Commerce Bank checking account balance of $7,887.00 on Schedule B, a statement that never was amended. That is nonsense. In the "Statement of Stipulated Facts" in the Pretrial Order, Mr. Howell agrees:

> On August 11, 2009, [Mr. Howell] purchased a cashier's check in
> the amount of $9,000 drawn on The Commerce Bank account number
> ending 1977 held in the name of "Nick Howell dba
> Athleteslounge.com" (the "TCB Account"). The balance in the
> TCB Account on August 10, 2009 before [Mr. Howell] purchased
> the $9,000 cashier's check was $9,294.96. On August 12, 2009,
> The Commerce Bank processed Seafair's garnishment and issued a
> check to Seafair's attorney in the amount of $9,294.96, leaving
> the TCB Account overdrawn.

Pretrial Order, Adversary Proceeding Docket No. 29, at Ex.1, p. 6. The statement verifying a $7,887.00 balance in the Commerce Bank account does not disclose the $9,000 cashier's check transaction or the true status of the Commerce Bank account on the petition date, even though, with extensions, Mr. Howell had 29 days before his initial schedules were filed to confirm their accuracy.

Mr. Howell's second argument is that he disclosed the $9,000 cashier's check transaction in his answer to Question 3b in his Statement of Financial Affairs, a response that was not amended in his Amended Statement of Financial Affairs. As noted above, Question 3b in the Statement of Financial Affairs requests business debtors to "[l]ist <u>each</u>

Page 24 - MEMORANDUM OPINION

payment or other transfer to any creditor made within 90 days immediately
preceding the commencement of the case . . . ."  Mr. Howell's response to
Question 3b states "See Attached" and indicates the amount or value of
such transfers as "$0.00" and the amount still owing as "$0.00."  Mr.
Howell references a $9,000 debit for "Cashier Check #302241-Nick Howell"
on page 6 of the fifteen-page, single-spaced attachment.  Leaving aside
the fact that the existence of the $9,000 cashier's check transaction is
not even responsive to the question asked, I find that Mr. Howell's
reference to the $9,000 cashier's check buried well within a multi-page
attachment to a question in the Statement of Financial Affairs is not a
meaningful disclosure and is tantamount to an omission to state a
material fact.

b) The $5,000 Counter Check and Cash on the Filing Date

The evidence is clear that Mr. Howell obtained a $5,000 counter
check from Morgan Stanley and cashed it at Bank of America on the morning
of August 12, 2009.  At his deposition, Mr. Howell testified that he put
the $5,000 in an envelope and gave it to Mr. Wallesen at the Northwest
Portland triathon store to cover payroll and expenses for the Hulaman
Triathlon.  At Trial, Mr. Howell testified that he personally paid
$3,000-$3,500 to employees at the Northwest Portland triathlon store and
left the balance for Mr. Wallesen to distribute.  Mr. Benjamin testified
that Mr. Howell came to the Northwest Portland triathlon store to pay
some of the "mechanics."  Mr. Wallesen testified that he had some contact
with Mr. Howell that day and that he received $1,500-$2,000 cash in an
envelope to pay flaggers and other expenses for the Hulaman Triathlon,
but that he received the cash in Hillsboro.  I found Mr. Wallesen's

Page 25 - MEMORANDUM OPINION

1  testimony credible.  Mr. Howell further testified that he did not

2  remember traveling to Hillsboro to deliver the cash to Mr. Wallesen.

3      Based on the series of event that occurred on August 12, 2009, as

4  described in testimony at the Trial, giving the benefit of the doubt to

5  Mr. Howell, I find that Mr. Howell distributed $3,000-$3,500 of the

6  $5,000 counter check proceeds to pay staff before his bankruptcy filing,

7  but at the time his bankruptcy petition was filed, he still was in

8  possession of $1,500-$2,000 cash that he did not disclose.

9  c) The Balance in the Morgan Stanley Business Account

10     In his schedules, Mr. Howell consistently states that the balance in

11  his Morgan Stanley business account at the time of his bankruptcy filing

12  was $780.00.  In the Pretrial Order, Mr. Howell admits that the $780

13  balance was inaccurate, but argues that the real balance actually was

14  negative (-) $780.00.  In his Exhibit V, admitted at the Trial, Mr.

15  Howell analyzed activity in the Morgan Stanley business account and

16  concludes that the actual balance on the filing date was negative (-)

17  $746.04.  The actual Morgan Stanley business account statements for

18  August 2009 show substantial activity in the account preceding, on the

19  day of, and following Mr. Howell's bankruptcy filing.  See Exhibit 12.  A

20  chapter 7 trustee, knowing about the existence of the Morgan Stanley

21  business account from Mr. Howell's Schedule B, would want to review the

22  account statements.  In this instance, I find any inaccuracy in Mr.

23  Howell's statement as to the balance in the Morgan Stanley business

24  account on the filing date not to be material.

25  d) 2009 Income Up to the Filing Date

26     Mr. Howell argues that he accurately stated his income for

Page 26 - MEMORANDUM OPINION

January 1, 2009 through the filing date as $43,200 in his response to Question 1 in his Statement of Financial Affairs and Amended Statement of Financial Affairs.  In his Trial memorandum, as noted above, he defined his income as "gross receipts less his business expenses."  See Adversary Proceeding Docket No. 28, at p. 14.  Since Mr. Howell has not yet prepared and filed his tax returns for 2009, he did not submit 2009 tax returns as exhibits, and I have no way to determine what expenses he characterizes as business expenses for tax purposes.  Suffice it to say that based on his own analysis of income v. expenses, as set forth in Exhibit X, Mr. Howell's views as to what constitute appropriate business expenses to be deducted from income can most charitably be described as aggressive.

The ultimate problem with Mr. Howell's statement as to his 2009 income in response to Question 1 in his Statement of Financial Affairs is that he does not answer the question asked.  Question 1 asks for the amount of gross income from employment or business operations.  The UST's bankruptcy analyst testified that, based on her review of Mr. Howell's bank statements and business records, Mr. Howell's gross income from January 1, 2009 through the filing date totaled $113,373.21.  See Ex. 42. Her consideration of deposits into the Howells' Consolidated Federal accounts during the subject period as a measure of at least a portion of Mr. Howell's gross income was appropriate in light of the fact that Ms. Howell was not gainfully employed.  See, e.g., United States v. Boulware, 384 F.3d 794, 811 (9th Cir. 2004) ("[I]f it be shown that a man has a business or calling of a lucrative nature and is constantly, day by day and month by month, receiving moneys and depositing them to his account

and checking against them for his own uses, there is most potent testimony that he has income . . . .") (quoting <u>Gleckman v. U.S.</u>, 80 F.2d 394, 399 (8th Cir. 1935)); 20A <u>Federal Procedure</u>, L. Ed. § 48:1610 (2011) ("Although the bank deposit method of reconstructing income is often used together with the net worth or other methods in a tax prosecution, the method need not be supported or corroborated by any other method or proof."). Deposits to the joint account number 2567 alone during that period totaled $81,318.13. <u>See</u> Ex. 42, at p. 1. Mr. Howell admitted at his Rule 2004 examination that his business gross income was in the range of $9,000 - $10,000 per month. <u>See</u> Ex. 45, at p. 67. As a measure of Mr. Howell's gross income during the period January 1, 2009 to the filing date, I find that $43,200.00 was a material understatement.

e) <u>The Brewing Equipment Proceeds</u>

Mr. Howell did not include his interest in the Brewing Equipment or proceeds from its sale in his original Schedule B, in spite of the fact that he received notice from Mr. Wolff by e-mail that Mr. Wolff had collected approximately $10,000 from liquidation of the Brewing Equipment and planned to distribute proceeds to the investors. That omission is perhaps understandable in that the latest e-mails were circulating on August 11, 2009, the day before Mr. Howell's bankruptcy filing, even though Mr. Howell did not file his original schedules until approximately thirty days later. <u>See</u> Ex. 36.

However, Mr Howell did not disclose his interest in the Brewing Equipment proceeds in his First Amended Schedules, and I find that omission to be both knowing and material. Mr. Howell received a check

for $4,021.39, representing his share of the Brewing Equipment liquidation proceeds on or about October 19, 2009. He signed the First Amended Schedules, including an amended Schedule B that did not include the Brewing Equipment proceeds, under penalty of perjury, a week later on October 26, 2009.

Ultimately, he included his interest in the Brewing Equipment, valued at $4,021.39, in his Second Amended Schedule B filed on January 11, 2011, but only after the trustee had learned about the Brewing Equipment proceeds and Mr. Howell had defaulted on his installment agreement to pay the $4,021.39 to the estate. Mr. Howell testified at the Trial that he finally paid the $4,021.39 to the estate with borrowed funds.

f) Testimony at the Meeting of Creditors

At his Meeting of Creditors, in spite of the deficiencies in his schedules and Statement of Financial Affairs discussed in detail above, Mr. Howell testified under oath 1) that he had reviewed his bankruptcy documents carefully before he signed them; 2) that the information in those documents was true and accurate as of August 12, 2009; and 3) that he had listed all of his assets and creditors. See Ex. 44, at pp. 2-3, 40.

g) Testimony at Mr. Howell's Rule 2004 Examination

At his Rule 2004 examination, Mr. Howell testified that the $2,400 cash he listed as an asset on his Schedule B was funds he obtained from his business and deposited into his wife's account "because her account had been garnished." See Ex. 45, at p. 79. As far as physical cash was concerned, Mr. Howell testified that he had "Zero."

Page 29 - MEMORANDUM OPINION

h) <u>Overall Findings and Conclusions under § 727(a)(4)(A)</u>

Based on the foregoing specific findings with respect to the factual allegations supporting the UST's § 727(a)(4)(A) claims, I find that Mr. Howell made multiple false oaths in his schedules and Statement of Financial Affairs. I further find that those false oaths were material individually and in the aggregate to an understanding of Mr. Howell's assets on the date of his bankruptcy filing and his business operations. I also find that Mr. Howell's false oaths were made knowingly and fraudulently for the following reasons.

Based on the evidentiary record of the Trial, I find that Mr. Howell had three principal goals when he filed for protection under chapter 7 of the Bankruptcy Code:

1) He wanted to discharge <u>most</u> of his indebtedness. His postpetition payment to Mr. Conway, who he did not schedule as a creditor, reflects an intent on the part of Mr. Howell to discharge his indebtedness selectively, preserving for payment those obligations he determined to be important for the continuation of his business operations.

2) Mr. Howell wanted to minimize the assets that could be claimed by his bankruptcy estate and creditors. That intent is reflected in his failures to disclose the $9,000 cashier's check transaction, the $1,500-$2,000 cash left over from the $5,000 counter check, and his share of the proceeds from the disposition of the Brewing Equipment until the belated disclosure in his Second Amended Schedule B.

3) Mr. Howell wanted to minimize the value of his business operations so that he could continue his proprietorship businesses

Page 30 - MEMORANDUM OPINION

without interference from the trustee and creditors postpetition.   That
intent is reflected in his use of an aggressive "net" income disclosure
in response to Question 1 in his Statements of Financial Affairs when the
question called for disclosure of "gross" income.   Aside from the
substantially greater calculation presented at Trial by the UST's
bankruptcy analyst (see Ex. 42), as noted above, Mr. Howell admitted at
his Rule 2004 examination that his business operations grossed between
$9,000 and $10,000 a month.   See Ex. 45, at p. 67.   That is a far cry
from his statement in response to Question 1 in his Statements of
Financial Affairs that his income for over seven months in 2009 was only
$43,200.

        While not cited by the UST as a basis for denial of discharge under
§ 727(a)(4)(A), Mr. Howell's failure to schedule the unpaid balance of
his WCVA community grant as an asset provides further support for my
finding that Mr. Howell intended to minimize the value of his business in
his bankruptcy.   The facts surrounding Mr. Howell's requests for
disbursements from the WCVA also support my finding that Mr. Howell was
not credible as a witness.   His statements that the WCVA agreed that he
would not need to be out any cash when he sought "reimbursements" is
simply not believable when: 1) Such an arrangement was contrary to
specific terms of the Grant Agreement.   2) Such an arrangement was
contrary to the instructions that Ms. Reinert testified she communicated
to Mr. Howell, and I found Ms. Reinert credible as a witness.   3) Such an
arrangement was contrary to the understanding of Mr. Howell's own
employee, Mr. Wallesen, and I found Mr. Wallesen credible as a witness.
4) Mr. Howell's requests for reimbursements were documented by invoices,

except with respect to athletes' purses, and written checks. Nothing in the evidentiary record lends credence to Mr. Howell's assertion that the WCVA was agreeable to reimbursing him based on his presentation of "dummy" checks that he had not distributed and/or did not intend to distribute.

As with the debtors in <u>In re Devers</u>, Mr. Howell "showed concern only with [his] own business survival, and therefore ignored one of the most important functions of the debtor in possession-to inform the creditors and court of the status of the business" in bankruptcy. 759 F.2d at 754. The result is the same.

I find that Mr. Howell knowingly and intentionally made false material oaths both with respect to his assets and his business in connection with his bankruptcy case, with the intent to deceive his creditors and the trustee about the extent of his assets and the value of his business operations. Accordingly, I find that Mr. Howell must be denied a discharge under § 727(a)(4)(A).

IV. <u>The UST's Other Claims</u>

Since I have concluded that Mr. Howell should be denied a discharge under § 727A)(4)(A), I do not need to address the UST's remaining claims under §§ 727(a)(2)(A) and 727(a)(2)(B).

<u>Conclusion</u>

In light of the foregoing findings and conclusions, a judgment shall be entered denying Mr. Howell's discharge under § 727(a)(4)(A). The UST should submit a judgment consistent with this Memorandum Opinion within ten days following its entry on the Adversary Proceeding docket.

# # #

Page 32 - MEMORANDUM OPINION

cc:  Nicholas Carl Howell
     U.S. Trustee
     Neil T. Jorgenson

Page 33 - MEMORANDUM OPINION